PIONEER CREDIT CORPORATION, Respondent, et al., Plaintiffs, *v.* MARCELINO SAN MIGUEL et al., Appellants.

First Department, June 30, 1948.

*George P. Doherty* of counsel (*James W. Foote* with him on the brief; *Foote & Doherty,* attorneys), for appellants.

*Neilson Olcott* of counsel (*John H. Jackson* and *John T. Norton* with him on the brief; *Olcott Havens, Wandless & Stitt,* attorneys), for respondent.

VAN VOORHIS, J. This is an appeal by defendants from a judgment in favor of plaintiffs against both defendants for the sum of $57,114 and interest, which it has been held that defendant La Commercial Industrial Mexasturca (hereinafter called Mexasturca) agreed to pay for Mexican customs duties on the shipment of 3,173 tons of reinforcing steel bars from Tampa, Florida, to Vera Cruz. The defendant Marcelino San Miguel has been held as a guarantor for Mexasturca.

The transaction has been involved in some confusion due to the nature of the contract and of the guaranty. The contract has at times been asserted by plaintiffs to have provided for a sale of these steel bars to Mexasturca, and at other times to have been for a shipment on consignment. The latter theory is the one which was finally adopted at the trial, and on which plaintiffs have been allowed to recover. The basis of the recovery is that, although Mexasturca was not obliged to pay to plaintiffs for this steel unless it elected to do so, or sold the steel to others in Mexico, nevertheless it contracted unconditionally to pay the customs duties on the importation thereof into that country. The court charged the jury: " Mexasturca was obliged, under the terms of that written agreement, to pay the Mexican duties on the steel. This had nothing to do with whether Mexasturca was to buy the steel or not. Mexasturca was not obliged to purchase the steel, but under the written memorandum it was obliged to pay the Mexican duty."

Thus we are not confronted with the question, which often arises where the consignee becomes insolvent, or where the goods have been lost or damaged, whether the transaction was a bailment or a sale. Here, in spite of previous contentions to the contrary, the plaintiffs have conceded that it was a bailment. After the defendant Mexasturca refused to buy the goods, plaintiffs proceeded to sell them to another party, recognizing that title had not passed to the defendants but remained in themselves. All claims for damages by reason of alleged breach

of contract to purchase the steel bars have been abandoned by plaintiffs. They seek to recover, and have been awarded, judgment for only the Mexican duty. The theory underlying this recovery, as expressed by plaintiffs' counsel during the trial, is that defendant Mexasturca was given an option to purchase, that the plaintiffs were to ship the steel bars to Mexico on a c.i.f. basis, and that Mexasturca was to pay the customs duties in consideration of being allowed this option.

These goods could not be cleared through the customs at Vera Cruz unless the duty were paid by someone. Actually the duty was paid by the third party to whom the steel was eventually sold (at a reduced price), after Mexasturca had refused to become responsible for this steel.

The decisive issue in the action (although that question was not submitted to the jury) is whether the defendant Mexasturca agreed by this contract to pay the Mexican duty, irrespective of whether it elected to become responsible for the purchase of the merchandise.

In *Burritt Co.* v. *Palmer-Marcy Co.* (236 N. Y. 135) the court held that a question of fact was presented to resolve an ambiguity in a written contract upon a question of sale or consignment. Here, although the question is a narrower one, it nevertheless is one of fact concerning whether, under a contract for a shipment on consignment, the consignee agreed to pay the import duty regardless of whether it purchased or disposed of the goods. The contract is ambiguous concerning whether the promise to pay the duty, like the promise to pay the purchase price of the goods, was intended to be conditional upon the exercise by Mexasturca of its option to reject on the one hand, or, on the other, to purchase or assume responsibility for the sale to others of the subject of the shipment.

In discussing the subject of consignments for sale, a textbook writer has said that " Where goods are sent to a consignee for sale (the usual form of transaction with a commission merchant or factor), there is no sale to the commission merchant. He merely acts as agent of the owner. When the factor sells the goods to a third party, the title is transferred from the original owner directly to the third party, and at no point in the transaction does it vest in the factor or commission merchant. * * * On a consignment no title passes. The consignor continues to own the goods. The consignee holds them as a bailee. If they are sold, the consignee holds the proceeds in the same manner." (Mariash on Sales, § 9.) Such a relationship as

has just been described is subject to such variations as may be established by the particular agreement. For example, "The parties may so deal that the consignee becomes a mere debtor to the consignor for the proceeds of sales, having a right to appropriate the specific proceeds to his own use. (*Baker* v. *N. Y. Nat. Ex. Bank,* 100 N. Y. 31; *Com. Nat. Bank of Penn.* v. *Heilbronner,* 108 id. 439)." (*Matter of Chambers,* 17 App. Div. 340, 343.)

In this case the contract provided as follows:

"It is agreed that Luis C. Varela and his financing associates will ship on consignment to La Commercial Industrial Mexasturca, S. A., Mexico, D. F., the above mentioned 3,173 tons approximately of reinforcing steel bars on consignment and on the following prices and terms:

"Terms: 50% of the total cost of the material c.i.f. Vera Cruz to be paid 60 days from date of invoice, the balance of 50% of the total, 90 days from the date of invoice.

Prices: On size ⅜″ the price will be $64.26 per net ton, 2000 lbs.
½″ the price will be $60.02
⅞″ the price will be $55.78
1″ the price will be $55.78
1¼″ the price will be $55.78

"These prices are in accordance with analisis made for the sale of these reinforcing steel bars, copy which is herewith attached, and which forms part of this agreement.

"La Commercial Industrial Mexasturca, S. A., Mexico, D. F., will pay for the Customhouse duties in Mexico.

"It is further understood and agreed that from the profits obtained from the sale of this material, the sum of $5,000.00 additional to the 6% included in the c.i.f. prices will be paid to the Pioneer Credit Corporation.

"From the balance of profits obtained on said sale, 10% is to be paid to Mr. Hernan Henriquez and the balance of 90% will be divided between La Commercial Industrial Mexasturca, S. A., Mexico, D. F., and Mr. Luis C. Varela."

It is noted that the clause that Mexasturca "will pay for the Customhouse duties in Mexico" is no more absolute in form than the agreement to pay the purchase price, viz., "Terms: 50% of the total cost of the material c.i.f. Vera Cruz to be paid 60 days from date of invoice, the balance of 50% of the total, 90 days from the date of invoice"; followed by an enumeration of the specific prices on the various diameters of the reinforcing steel bars.

There was a dispute over what paper was the " analisis " that was incorporated in this agreement by reference, but for the purposes of this appeal, we assume that it was the English " analisis " as the jury have evidently found. This document lists the tonnage of reinforcing steel bars contained in the shipment according to their various diameters, it sets forth the prices per ton f.o.b. Tampa, Florida, adds a 6% export premium, the freight to Mexico, the cost of insurance, the Mexican duties and the ceiling prices for sales in Mexico under Mexican price fixing regulations. This is followed by a statement in dollars in Mexico of the profit on the sale of the entire lot at ceiling prices, after deduction for all of the previously enumerated items, including the Mexican duties. Such profit is computed at $87,760.39.

The testimony is that Mr. Hernan Henriquez, who is mentioned in the agreement as entitled to receive 10% of the profit, took no part in the transaction, and that the agreement was modified orally so as to provide that the entire profit, after payment of the sum of $5,000 to Pioneer Credit Corporation, should be divided evenly between Luis C. Varelo and Mexasturca.

The intention of the transaction, as disclosed by this agreement, was clearly, as has been stated, that these 3,173 tons of steel bars were to be shipped to Mexasturca on consignment, that Mexasturca was given the option of purchasing them at the prices stated, in which event at least plaintiffs were to bear the cost, insurance and freight to Vera Cruz, and Mexasturca was to meet all charges or expenses accruing after arrival at Vera Cruz, including the customhouse duties into Mexico, that Mexasturca would endeavor to resell these bars, in which event it would first pay to plaintiff Pioneer Credit Corporation $5,000 out of profits on the resale arising after deducting all of the items mentioned in the " analisis " hereinbefore enumerated, and that the balance of such profit would be divided equally between Mexasturca and said Luis C. Varela. In carrying the deal into effect, as the testimony indicates, it was contemplated that before obligating itself to take this steel off from plaintiffs' hands, Mexasturca would obtain a purchaser or purchasers who would, it was hoped, buy as nearly as possible at Mexican ceiling prices, thus realizing an anticipated profit of $87,760.39 after payment of the Mexican duties and all other expenses, which would be divided (after payment of $5,000 to Pioneer) by Mexasturca and Varela, share and share alike.

The transaction in practical effect is similar, in some respects, to one with a commission merchant or factor where the latter

disposes of goods as agent for a principal. In this instance, the "commission" or profit to Mexasturca was to be one half of the total profit (less $5,000 to Pioneer) to be derived from the sale to Mexican purchasers, such profit to be computed after deduction of the fixed price to plaintiffs and after all estimated expenses, including Mexican duties. A factor is accustomed to advance money on loan to the principal, in order to help finance the transaction, holding the goods as security for repayment of the loan. In this instance, according to plaintiffs' theory, Mexasturca agreed to aid in financing by advancing the necessary funds to pay the import duties, but without any obligation on plaintiffs' part to reimburse, and without any lien upon the goods in event that Mexasturca elected not to become responsible for the purchase price. Mexasturca would be reimbursed for payment of this $57,114 duty only out of the proceeds of resale of these steel bars, and its incentive would be the possibility of deriving the additional sum of $41,380.19 as its share in the maximum profit possible under the Mexican price ceilings. The "analisis" attached to the contract does not indicate that the duty was to be paid out of this share in the profit; it demonstrates that the profit was to be computed after payment of the duty, as was also testified to by the President of Pioneer Credit Corporation, R. K. Wheeler. Nevertheless, according to plaintiffs' interpretation of the transaction, which has been sustained below, plaintiffs were under no obligation to reimburse Mexasturca for moneys advanced to pay the import duty, and Mexasturca is provided with no means of being recompensed upon electing not to assume responsibility for the merchandise shipped on consignment.

We think that it is not so clear that the trial court was warranted in instructing the jury, as matter of law, that Mexasturca was obligated unconditionally under the terms of this written agreement to pay the Mexican duties on this steel. The contract leaves open for determination, as a question of fact, whether that was the intent of the instrument, or whether payment of the import duties by Mexasturca was conditioned, like the obligation to pay the purchase price, on making an election to purchase the steel. The expression "c.i.f.", as it is used in this contract, does not necessarily signify that plaintiffs are to defray no more than the cost, insurance and freight regardless of whether Mexasturca chose to buy the goods. This abbreviation is contained in the terms of sale, along with the

price, and it is reasonable to contend that it is applicable only in event that Mexasturca elected to buy or become responsible for the disposal of the consignment. In form, as has been stated, the terms of sale bespeak an absolute obligation to pay; so, also, does the clause obligating Mexasturca to pay for the custom house duties. A question of fact is presented whether the use of the words, " On consignment ", did not import a condition into the promise to pay for the customhouse duties as well as into the promise to pay the purchase price, and make both obligations dependent on Mexasturca's election to take the goods.

Insofar as the personal guaranty by defendant Marcelino San Miguel is concerned, that would, at the most, stand or fall with the principal obligation. The undisputed testimony is that Mr. San Miguel, who spoke English with difficulty, drafted his own form of guaranty in Spanish, which he signed after it had been translated accurately into English. He guaranteed by this document to plaintiff Pioneer Credit Corporation, that Mexasturca " will pay you for all the quantities of steel that they dispose of this lot once the material has been landed in Mexico with all the required documents in proper order and that any quantity that said company fails to pay within the terms agreed upon, which are indicated below, will be paid by myself, on request. The terms agreed upon for payment are 50% at 60 days, balance 90 days." Limitation of this guaranty to " all the quantities of steel that they dispose of this lot " indicates, clearly, that he envisaged the transaction as being on consignment, and did not intend in signing that paper to obligate himself for the import tax or other expenses, but only to guarantee payment to Pioneer of the selling prices of steel disposed of by Mexasturca after it had been landed in Mexico. This has been admitted by plaintiffs' counsel on the argument. On the following day, March 24, 1945, at the instance of Pioneer, San Miguel signed a supplemental guaranty, in English, which he and his witnesses testified was requested solely in order to bind his estate, in event of his death, to the same obligation which had just been described that he signed on March 23, 1945. He testified that he did not require any Spanish translation, but relied on the representation made to him by the president of Pioneer that the English words which he signed had that meaning. Actually the English words which he signed purported to bind him, his executors and administrators, to be responsible for all of Mexasturca's liabilities by reason of this transaction.

The trial court submitted to the jury whether the said supple-

mental guaranty by San Miguel was obtained by fraud and the jury's verdict was that it was not so obtained.

The trial court also submitted in general terms, whether the steel bars that were shipped were in conformity with the contract. Mexasturca's manager testified that the reinforcing steel bars that were shipped were not corrugated, and that many of them had been cut by an acetylene torch, and had been welded together. He also testified that they were cut into different lengths of from fifteen to forty feet. No contractual specification of length has been shown, nor any prohibition against welding, but the " analisis " in Spanish which defendants contend was annexed to the contract, called for corrugated steel. The English " analisis " contained no such requirement. The issue of whether there was a breach of contract, therefore, appears to have resolved itself into a question of whether the English or the Spanish " analisis " was the one which was annexed to the contract. The jury by their verdict signified that they found that the English " analisis " was thus annexed.

The defendants' counsel appears not to have excepted to the instruction to the jury that under the terms of the contract there was an absolute obligation on Mexasturca to pay the import duties, but it has been held (*Newborn* v. *Peart,* 219 App. Div. 249) that the Appellate Division may review such a ruling without an exception, as a question of fact, if there has not been a fair trial. In the case cited, the court said: " The case was submitted to the jury upon an erroneous theory and there should be a reversal in order that the real issue may be decided by a jury. (*Coble* v. *Potter,* 155 App. Div. 716; *Levine* v. *Rosenschein,* 134 id. 157.) " (P. 251.) (See, also, *Alden* v. *Knights of Maccabees,* 178 N. Y. 535, 541.) A motion for new trial is no longer necessary, in such a situation, now that the Appellate Division may review the facts on an appeal from the judgment. (*McKellar* v. *American Synthetic Dyes,* 229 N. Y. 106; see Civ. Prac. Act, § 608.) The facts in this case are complex and confused, nor did counsel for the defendants aid the trial court by bringing this point sharply to his attention. It can hardly be said that the point was not raised, however, inasmuch as a good deal of the testimony and argument for the defendants is directed toward that issue without bringing it into definite focus.

Since there is to be a new trial, mention should be made of the counterclaim by defendant Mexasturca for the sum of $9,484 paid by it in unloading charges for this steel, which, at one time,

plaintiffs telegraphed that they would pay. In the view taken by the trial court, it was the duty of plaintiffs to pay cost, insurance, freight and nothing further, even if Mexasturca did not take up these goods on consignment. Implicit in that ruling, was a determination that there was an unconditional obligation on the part of Mexasturca to pay all expenses connected with the shipment after the arrival of the steamer at Vera Cruz, if the goods were what they were supposed to have been. Therefore, the only issue in respect to the unloading charges which was submitted to the jury was whether the reinforcing steel bars that were shipped conformed to the contract. That issue, as has been stated, was resolved by the jury in favor of the plaintiffs, and, therefore, the counterclaim for the unloading charges was dismissed. In the view which we take of the case, it would be open to the jury to have found that " c.i.f." was part of the terms of sale, and, therefore, applicable to the transaction upon election by Mexasturca to purchase at the prices and on the terms stated, but that these terms were not controlling in event that Mexasturca were to decide not to purchase or dispose of the subject of the shipment. We think that the question of who is to pay for unloading, like that of who is to pay for the Mexican duties, was left in ambiguity in the contingency that Mexasturca did not buy or dispose of the goods. It, also, presented a jury question.

The judgment appealed from should be reversed, and a new trial granted, with one bill of costs to the appellants to abide the event.

GLENNON, J. P., COHN, CALLAHAN and SHIENTAG, JJ., concur.

Judgment unanimously reversed and a new trial granted, with one bill of costs to the appellants to abide the event. Settle order on notice.